In the Matter of the Estate of AXEL WILLIAM SWAHN, Deceased.

Surrogate's Court, Kings County, January 27, 1936.

*Peter A. Peterson*, for the proponent Peter A. Peterson, executor, and Elizabeth Swahn McDarrah, daughter, legatee.

*Harry I. Huber* [*Hallam M. Richardson* of counsel], for the contestants Arthur W. Swahn and Frances Swahn Watson.

*James F. Toohy*, special guardian for David Hart McDarrah and Frederick William McDarrah, legatees.

WINGATE, S.   So far as is ascertainable from reported decisions, the present is the first application ever made to a probate court in an English-speaking jurisdiction for the taking of blood tests as bearing upon a question of relationships.

The alleged will, which has been propounded for probate, purports to bequeath the bulk of the estate to " my daughter, Elizabeth Swahn McDarrah " and " my grandchildren, David Hart McDarrah and Frederick William McDarrah."

The usual omnibus broadside of objections has been interposed by a son of the decedent who is cut off with a bequest of five dollars. As amplified by his bill of particulars, it appears that certain of the alleged acts of fraud and undue influence upon which the contestant relies are, that " Elizabeth Swahn McDarrah " falsely represented to the decedent, *first*, that she was his daughter; *second*, that she was married to one Howard McDarrah, and *third*, that the children " David " and " Frederick " were her children by said Howard McDarrah.

It is readily conceivable that if these representations were actually made, and were false in fact, they may have so tainted the instrument by fraud or undue influence that denial of probate should follow.

Obviously, the establishment of these objections would require a dual demonstration by the contestant: *First*, to the effect that such

representations were actually made, and *second*, that, if made, they were false in fact. It is in supposed aid of the second of these essential links in his chain of proof that the contestant seeks " an order directing a duly licensed doctor to make blood grouping tests of the infants known as David McDarrah and Frederick or ' Freddy ' McDarrah and of their alleged parents Elizabeth McDarrah and Howard McDarrah and directing that the findings and conclusions be reported to the Surrogate of the County of Kings for further consideration and his determination as to the use, application and advisability thereof."

The law of this country, as evidenced by reported adjudications, is in an extremely primitive state as compared with the practice in European jurisdictions on the subject here involved. It is credibly asserted that blood grouping tests are commonly accepted as admissible evidence on questions of paternity in the courts of Germany, Austria, Denmark, Sweden, Italy, Russia, Poland, Japan and England (Dr. Max Lederer, Associate Professor of Pathology, L. I. College of Medicine, 60 Medical Times & L. I. Med. Jour. 209, 210), and its allowance in two comparatively recent unreported cases in England, *Rex* v. *Kell* and *Rex* v. *Blakeman,* is vouched for by an article in the *London Law Times* reprinted in the issue of the *New York Law Journal* on February 13, 1932, at page 810. Such use in Continental European countries has apparently been widespread during the past decade, since over 5,000 instances of its employment during the three years between 1926 and 1929 have been collected (See Alexander S. Wiener, M. D., N. Y. L. J. Feb. 4, 1935, p. 614) and it is estimated that the instances since 1929 have at least trebled this number.

The research of the court has disclosed only three reported cases in the United States in which the propriety of such evidence has been an issue. In *Commonwealth* v. *Zamarelli* (17 Pa. D. & C. 229), decided in 1931, Judge Morrow, in a bastardy proceeding, granted a new trial on the basis of blood tests showing by blood grouping that the defendant could not have been the father of the child in question. On the other hand, on December 29, 1933, the Supreme Court of South Dakota in *State* v. *Damm* (62 S. D. 123; 252 N. W. 7, 12) held that the refusal of the trial court to permit the tests in a case of alleged rape, was not an abuse of his discretion, the assigned reason for the determination being that the reliability of the tests had not been sufficiently established.

The most interesting case from an historical viewpoint is *Beuschel* v. *Manowitz* (151 Misc. 899), decided by Mr. Justice Steinbrink in the Supreme Court, Kings county, in January, 1934. The action was a suit for damages for carnal assault, which the plaintiff alleged

had resulted in the birth of a child. The conclusion of the learned justice was that such an examination was permissible under the then existing provisions of section 306 of the Civil Practice Act, authorizing physical examination. While his chief legal reliance was placed on the Fourth Department decision in *Hayt* v. *Brewster, Gordon & Co.* (199 App. Div. 68), wherein the taking of blood tests for the purpose of establishing the general physical condition of a party was permitted, his opinion contains a scholarly review of the progress of the law in the recognition and application of scientific discovery.

Unfortunately for its authority as a presently pertinent precedent, it was unanimously reversed by the Appellate Division (241 App. Div. 888) and thereafter leave to present the question to the Court of Appeals was doubly denied (242 App. Div. 649, and 265 N. Y. 509).

The policy of the State in respect to evidence of this variety was, however, reversed at the succeeding session of the Legislature which, by chapter 196 of the Laws of 1935, made effective March 22, 1935, enacted the following addition to the Civil Practice Act.

" § 306-a. Blood grouping tests. Wherever it shall be relevant to the prosecution or defense of an action, the court, by order, shall direct any party to the action and the child of any such party to submit to one or more blood grouping tests, the specimens for the purpose to be collected by duly qualified physicians and under such restrictions and directions, as to the court or judge shall seem proper. The order for such blood grouping tests may also direct that the testimony of the persons so examined may be taken by deposition pursuant to this article."

Whereas the phraseology of this section relates in terms merely to " an action," it is unquestionable, on established principles, that it is applicable to a proceeding in the Surrogate's Court. (*People ex rel. Lewis* v. *Fowler*, 229 N. Y. 84, 86, 87; *Matter of Levy*, 198 App. Div. 773, 775; Surr. Ct. Act, § 316.) In this regard, section 306-a, while grouped under the same article of the Civil Practice Act as section 306, relating to physical examination, is much broader in its scope than the latter, which confines the remedy to " an action to recover damages for personal injuries," which obviously is not maintainable in the Surrogate's Court. (*Matter of Leland*, 175 App. Div. 56, 58.) In the enactment presently under consideration, however, no such limitation appears. The language here is " an action," which, when read with the universal implication inherent in the opening word " whenever," indicates a legislative intent that this new species of evidence, which has apparently achieved universal scientific acceptance, shall be made

available in any litigation in any court of the State when its employment may conceivably throw light on the justness of either of the opposing contentions.

A consideration of the events immediately antedating the enactment is further consonant with this view of general applicability. The reversal of Mr. Justice STEINBRINK's determination and the inability of the litigants to attain an opposite result after the exhaustion of every available legal mode of procedure, was obviously the motivating force behind the enactment. Its legislative reversal, therefore, amounted to a determination by the ultimate authority of the People themselves, that evidence of the variety in question should be acceptable as an aid in the determination of questions to which it pertains.

The sole limitation imposed by the Legislature as to whether the test in question is to be permitted in any given action, is that the result of such test " be relevant to the prosecution or defense." This obviously presupposes a certain degree of knowledge by the court to which the application is made, as to the object and effect of tests of this variety. It is, however, no straining of the doctrine of judicial notice for a particular tribunal to affirm its awareness of the fact that the principle underlying such examinations is that certain characteristics or properties of the blood of a parent perpetuate themselves in that of his or her offspring in accordance with the Mendelian Law, and that the results of such tests are, therefore, potentially relevant in the determination of whether a given child is the offspring of specified adults, or, *vice versa*, whether a given adult is the mother or father of a particular child.

The determination of the applicability of the limitation imposed by the Legislature in this regard resolves itself, therefore, into one of whether the establishment of the fact that a particular child is or is not the offspring of a given party to the action is relevant to the prosecution or defense of such action. If this question is answerable in the affirmative, the terms of the statute are mandatory, that " the court * * * *shall* direct " that the tests be taken.

In the case at bar the question is relevant, as hereinbefore demonstrated, being one of the two essential links in the chain of establishment of the objection that Elizabeth McDarrah perpetrated a fraud on this decedent by representing to him that David and Frederick were her own children. It is accordingly an instance in which a direction to submit to blood grouping tests has been mandatorily directed by the Legislature.

At this point, however, the applicant encounters difficulty in the relief which he seeks. His petition prays that submission to

the taking of blood grouping tests be directed not only as to Elizabeth McDarrah, who is a party to this proceeding, and as to her two reputed children, David and Frederick, but also as to her husband, Howard McDarrah, who is neither a legatee under the propounded instrument, nor a statutory distributee of the decedent, nor even a party to the present proceeding. In so far as the application seeks to include this last named individual in the desired direction, it plainly transcends the permissible scope of the statute which includes as properly examinable persons merely " any party to the action and the child of any such party." Howard McDarrah does not come within this description, wherefore, the court is powerless to include him in its order. His examination would, furthermore, be in the nature of an examination of a witness before trial which is not permissible in this State except in certain extremely limited and particularly specified situations not here present. (*American Woolen Co.* v. *Altkrug*, 139 App. Div. 671, 672; *McCullough* v. *Auditore*, 216 id. 510, 512; *Matter of Ebbets*, 149 Misc. 260, 271; 153 id. 775, 777, 778.)

Whereas the considerations hereinbefore discussed are decisive as to the right of the contestant to a direction that the alleged daughter of decedent and her putative children submit to the tests, it is a matter of interest as to the possibilities of demonstration which still remain open with the exclusion of her alleged husband from the examination and as to " the restrictions and directions," if any, as specified in the statute, which the court should impose in connection with the tests. In this regard a somewhat fuller acquaintance with the general subject is requisite than has hereinbefore been disclosed.

Blood tests the results of which possess potentially probative values on issues of heredity, are two in number. The first is based on the discovery of Dr. Karl Landsteiner of the Rockefeller Institute, announced in 1900, that in man, the serum of certain individuals could clump or agglutinate the red blood cells of certain other individuals. Human " blood is made up of two main fractions, the red cells, which give the blood its color and a fluid called the plasma (or serum, [which is the fluid remaining after coagulation of the plasma]). In the human red blood cells there are two substances called agglutinogens A and B. If an individual possesses both these substances in his blood cells, he is said to belong to group AB, if neither, he belongs to group O; if he possesses only A, to group A; and if only B, he belongs to group B. In the serum are two substances called agglutinins " designated as the Greek letter $\alpha$ (or anti-A) and the Greek letter $\beta$ (or anti-B). If a serum containing agglutinin $\alpha$ is mixed with red blood cells

containing the agglutinogen A (group A or group AB), these cells will be clumped together (or agglutinated) or may be entirely destroyed. On the other hand, such a serum would not affect red blood cells not containing A (of group O or group B). Similarly agglutinin $\beta$ acts on bloods of group B and group AB, but not on bloods of group O or group A. Naturally, an individual of group A cannot have agglutinin $\alpha$ in his serum; and neither can a group B individual possess agglutinin $\beta$.

The constitution of the four blood groups and their approximate frequencies in New York City are estimated by an eminent authority to be as follows:

| Group | Frequency (Per cent) | Red blood cells (Agglutinogen) | Serum (Agglutinin) |
|---|---|---|---|
| O........ | 40 | .......... | $\alpha$ and $\beta$ |
| A........ | 40 | A | $\beta$ |
| B........ | 15 | B | $\alpha$ |
| AB...... | 5 | A and B | .......... |

" The medicolegal application of blood grouping for the exclusion of paternity depends on the following three important properties of the blood groups: (1) The blood group of any individual can be determined at birth or shortly thereafter; (2) the blood group of every individual remains constant throughout life and does not change regardless of age, disease, medication, etc.; (3) the blood groups are inherited in accordance with Mendel's laws."

The following table has accordingly been evolved:

THE LANDSTEINER BLOOD GROUPS IN PARENTS AND CHILDREN
(Bernstein theory)

| Groups of parents | Groups of children possible | Groups of children not possible |
|---|---|---|
| 1. O+O.............. | O | ..........A, B, AB |
| 2. O+A.............. | O, A | ..........B, AB |
| 3. O+B.............. | O, B | ..........A, AB |
| 4. A+A.............. | O, A | ..........B, AB |
| 5. A+B..............O, A, B, AB | | ................. |
| 6. B+B.............. | O, B | ..........A, AB |
| 7. O+AB............. | A, B | ..........O, AB |
| 8. A+AB............A, B, AB | | ..........O |
| 9. B+AB............A, B, AB | | ..........O |
| 10. AB+AB............A, B, AB | | ..........O |

The second series of tests, which is wholly distinct from those hereinbefore noted, is based on the research work of Drs. Landsteiner and Levine, who, in 1927, " discovered two additional

agglutinogens, M and N, in human red blood cells. These agglutinogens had not been previously observed because normal human or animal sera do not contain agglutinins against M and N. However, by injecting human blood into rabbits, or other animals, such as cats and goats, sera may be obtained with agglutinins for M and N. The agglutinogens M and N are entirely independent of the agglutinogens A and B and define three distinct types of human blood as follows: Type M (blood possessing only agglutinogen M) — this type makes up approximately 30 per cent. of the general population; Type N (blood possessing only agglutinogen N) — 20 per cent.; Type MN (blood possessing both agglutinogens, M and N) — 50 per cent. No individuals have been found whose blood lacks both agglutinogens M and N in more than 30,000 tests made to date. In 1928, Landsteiner and Levine showed that the MN types are also inherited according to Mendel's law."

As a result of almost innumerable experiments, two basic principles or laws relating to the agglutinogens M and N have been found to exist, namely, " (1) The agglutinogens M and N cannot appear in the blood of a child unless present in the blood of one or both parents; (2) a type M parent cannot give rise to a type N child, and a type N parent cannot have a type M child." As a result, the following table has been constructed relating to the agglutinogens M and N in parents and children.

| Types of parents | Types of children possible | Types of children not possible |
|---|---|---|
| 1. MN + MN | M, N, and MN | |
| 2. MN + N | N and MN | M |
| 3. MN + M | M and MN | N |
| 4. M + N | MN | M and N |
| 5. N + N | N | M and MN |
| 6. M + M | M | N and MN |

For the data hereinbefore set forth, the court is chiefly indebted to the following articles: " Determining Parentage," by Dr. Alexander S. Wiener, Department of Pathology, Jewish Hospital, Brooklyn, N. Y., in volume 40, Scientific Monthly, page 323 (April, 1935); " Determination of Non-Paternity by Means of Blood Groups," by the same author, volume CLXXXVI American Journal of The Medical Sciences, page 257 (August, 1933); " Practical Application of the Determination of Blood Groups," by Max Lederer, M. D., Associate Professor of Pathology, Long Island College of Medicine, in 60 Medical Times and Long Island Medical Journal, page 209 (July, 1932); " Principles and Technic of the Determination of Blood Groups," by Silik H. Polayes, M. D., Assistant Professor of

Pathology, Long Island College of Medicine, 60 Medical Times and Long Island Medical Journal, 206.

The question of the utility of blood grouping tests of a putative mother and child, without the examination of the alleged father, is answered in an article by Drs. Alexander S. Wiener, Sidney Rothberg and S. A. Fox in volume XXIII of the Journal of Immunology, 63, at page 70, as follows: " Should the question of non-maternity be raised in a case of this nature, or in any other case, it may often be solved by means of the agglutinogens M and N. Thus, if the supposed mother is of type $M+N-$ and the child of type $M-N+$, or *vice versa*, non-maternity is proved. Where non-maternity exists, it can be detected in 12.5 per cent of the cases by means of the agglutinogens M and N."

They also reach a similar conclusion if the mother belongs to group AB and the child to group O, although calling attention to the fact that the chances of proving non-maternity by means of the Landsteiner blood groups alone, without reference to the agglutinogens M and N, is less than five per cent.

All authorities agree with the statement of Professor Lederer in the article above cited that " it is impossible under any conditions to state in a positive way that a given child is the offspring of a given adult or *vice versa*. It is, however, an established fact, that in certain instances it can be shown that a certain individual cannot be the parent of certain offspring or *vice versa*" (p. 210).

All further agree that, especially in the making of the M and N tests, the services of a thoroughly experienced expert are required. This leads the court, in the limited granting of the present application, to impose as a first condition that the tests are to be conducted by Alexander S. Wiener, M. D., who, the court is satisfied, is generally recognized by the medical profession as an outstanding authority on the subject, or by some other person agreed to by all parties and approved by the court.

The further condition imposed is inherent in the nature of the issue to which the tests possess potential relevancy, namely, that the results of the tests shall not be admissible in evidence until after the contestant has made a *prima facie* demonstration that Elizabeth McDarrah actually represented to the decedent that the putative children, David and Frederick, were her own offspring.

Enter order on notice accordingly.