OPINION OF THE COURT
Bruce M. Kaplan, J.
A paternity suit is singular in the range of emotions and events that it encompasses. The instant matter which was commenced when the child Nahdia was seven years old well illustrates that adage.
After consideration of the testimony and documentary evidence adduced by petitioner, and the documentary evidence introduced on respondent’s case, the petition is dismissed.
The failure of petitioner’s case is ascribable not only to the manner in which her counsel failed to utilize effectively a wealth of available documentary evidence, but also *923 his failure to elicit from petitioner the quality of testimony necessary to prevail.
On direct examination petitioner testified that she had had sexual relations with respondent exclusively at the time she became pregnant with Nahdia, and that she commenced a paternity proceeding in late 1972. She further claims that she dropped the proceeding at respondent’s behest.
Petitioner also introduced 23 writings which included two bills paid on behalf of Nahdia by respondent, and various letters, cards, and postcards sent by respondent to Nahdia from various locations around the world over a five-year period between 1974 and 1979. No attempt was made to elicit any information as to the circumstances attendant upon the receipt of these writings or any conversation which they occasioned between the parties.
Nahdia’s birth certificate listed Llewellyn Ernest M. as her father. Llewellyn M. was married to petitioner at the time that Nahdia was born, but she barely alluded to this fact on her direct examination.
It was only on redirect that petitioner’s counsel broached the subject of nonaccess. The matter was explored perfunctorily with no more information elicited than that the last time petitioner had seen Llewellyn M. was at her mother’s funeral in June, 1968, and that shortly thereafter he was stationed in the Philippines in the United States Army Air Force.
The cross-examination of petitioner by respondent’s counsel essayed two of the classic functions of that endeavor. He probed petitioner’s ability to observe, recall and relate, and undermined her credibility by confronting her with documentary evidence which was at odds with crucial aspects of her testimony. With respect to the first, petitioner’s capacity to recollect financial details, time sequences and actual dates was shown to be minimal.
With respect to the second, respondent not only showed that Llewellyn M. was listed as Nahdia’s father on her birth certificate but also that she named one Ray V. as Nahdia’s father on a statement of alleged paternity which petitioner signed on June 4, 1973.
*924 Her explanation of how the name Jimmy C. appeared on some of the other documents was a straightforward one. She contended that Jimmy C. was a fictitious entity, and that respondent importuned her to make up that name when she spoke to Department of Social Services (DSS) representatives.
This explanation is simply incredible. On redirect petitioner testified that she discussed with respondent her intention to apply for public assistance because he wasn’t giving her enough money, and that she would have to give his name as the father. He asked her not to. He said “well, use Jimmy C. Use that name because if I had used his name his job would have been in jeopardy and would have messed things up with his wife.”
This conversation would logically have had to occur prior to June 4, 1973, when petitioner applied for public assistance and signed a statement of alleged paternity, if petitioner is to be believed. Yet the name of Jimmy C. does not appear on that document. Rather, petitioner named Ray V. as the putative father.
It was not until June 10, 1976 that petitioner furnished the name Jimmy C. at a face-to-face recertification.
These unexplained inconsistencies cannot be ascribed to innocent confusion. Respondent resourcefully demonstrated that petitioner had previously attempted to manipulate the social services system to her financial advantage, and in fact had been caught at it.
AN HLA TEST REPORT CANNOT BE ADMITTED INTO EVIDENCE WITHOUT A PROPER FOUNDATION FOR ITS INTRODUCTION
Petitioner’s attempt to introduce into evidence the written report embodying the results of a comprehensive blood test raises three distinct issues. (1) Can a particular item be introduced into evidence? (2) What is the proper manner of its introduction? and (3) May the court take judicial notice of the test results?
The question of the admission into evidence of the RBC enzyme and RBC serum protein test results turns on whether these results are legally competent notwithstanding the court’s direction that the parties submit to these tests.
*925 The court could not properly admit these test results into evidence because the Legislature, by enactment of chapter 9 of the Laws of 1981, removed only the bar to the receipt into evidence of HLA test results. It left it undisturbed with respect to the RBC enzyme and RBC serum protein tests.
It is of no moment to argue that RBC enzyme and RBC serum protein tests are generally accepted as reliable in the scientific community. That remains a matter for legislative determination, one which may be slow to come. It is not uncommon for a hiatus to occur between a test acceptance as valid for the scientific community and legislative recognition of that fact. A considerable time elapsed between the early part of this century when Dr. Karl Landsteiner discovered human blood groups, and subsequent understanding of their heredity aspects made possible the eventual use of blood tests to scientifically evaluate allegations of paternity (Little v Streater, 452 US 1, 6-8), and the acceptance of such data as valid evidence in New York.
Indeed, it was not until 1935 that the use of the ABO test as evidence of exclusion was authorized by the Legislature. (See L 1935, ch 196; Matter of Swahn, 158 Misc 17.)
It may well be that the Legislature will broaden the categories of blood tests which may be received into evidence to include RBC enzyme and RBC serum protein tests. This court would strongly urge the Legislature to do so.
However, it is unwarranted to characterize the failure to include these tests in the liberalizing language of chapter 9 of the Laws of 1981 as a mere oversight. One reason that this legislation was enacted was that the Legislature was urged to do so in several cogently worded and highly persuasive Family Court decisions.
Judge Huttner in Edward K. v Marcy R. (106 Misc 2d 506) and Judge McDonald in Jane L. v Rodney B. (103 Misc 2d 9) exhorted the Legislature to allow the inclusory results of HLA tests to be admitted into evidence. Similarly, in Matter of Goodrich v Norman (100 Misc 2d 33), Judge Miller recommended that the Legislature revise section 532 of the Family Court Act. She made reference to the Joint AM A/ABA Guidelines: Present Status of Serolo *926 gic Testing in Problems of Disputed Parentage (10 Fam L Q 247), an article which reviewed the AM A/ABA joint report on the use of blood tests in paternity proceedings.
These decisions all urged the Legislature to amend section 532 to render admissible the results of HLA testing.
The Legislature acted responsively to those urgings. It may have done so with respect to RBC enzyme and RBC serum protein testing if it had been specifically importuned to do so since a higher degree of plausibility of paternity index is obtainable by recourse to them. This higher degree is ascertainable because the plausibility of paternity as calculated by the Essen-Moller formula necessarily becomes greater when additional genetic marker test results are employed to establish the ratio between a random man furnishing a gene found in the child but not in the mother, and a man of the putative father’s type furnishing it. Since the formula W (plausibility of paternity)
= 1involves multiplying the individual ratios of the various systems to determine Y/X, it follows that utilizing additional test results that do not exclude any random men would boost the level of probability. Until the Legislature acts, there is a statutory bar to the receipt of such test results into evidence.
The court is aware of the opinion of Judge Torres in Catherine H. v James S. (112 Misc 2d 429). I must respectfully decline to follow it.
The Legislature has addressed the question of what particular blood tests may be received into evidence and it remains the province of the Legislature, and not that of the courts to enlarge that area.
When documentary evidence in the form of a written report is proffered for introduction into evidence, two facets must be considered. First, may a particular item be introduced; and only if that question is answered in the affirmative does the discussion proceed to how it may be introduced.
The language presently contained in section 532 of the Family Court Act had its genesis in the 1930’s when decisional law precluded the introduction of evidence dem *927 onstrating exclusion of paternity based on ABO red blood cell test results. The court in Taylor v Diamond (241 App Div 702) found no predicate for its introduction at that time. The Legislature, after determining that exclusion based on the results of the ABO test was generally accepted as reliable within the scientific community, overruled the decisional law by amending the statute to permit the introduction of evidence of exclusion under the ABO test.
Had the courts found that these were acceptable tests and permitted introduction, the legislation would not have been necessary. Indeed, it is the rare case where the Legislature authorized the introduction of specific evidentiary matters. The Legislature was slow to ratify the validity of HLA tests, and only after prodding by Judges of this court was the introduction of the HLA test results specifically authorized.
The fact that HLA tests are permitted to be introduced does not go to the manner of their introduction. The common law has established the procedure by which written reports or other written matter is introduced into evidence. The admissibility of properly certified hospital bills, records, books, papers or other things of a department or bureau of a municipal corporation or the State pursuant to CPLR 4518, and the special rules contained in article 10 of the Family Court Act are exceptions to the generally applicable rules of evidence.
The present language of the statute, therefore, cannot serve as a predicate for introduction without further foundation.[1] The respondent has a right to cross-examine the *928 maker of a document. It is especially vital in an endeavor of this nature because the report not only contains objective findings, but also makes or adverts to conclusions that may be drawn as well. The respondent most certainly would have a right to ascertain how the statistical premises which are used to calculate the index of paternity are arrived at.
While the court is in great favor of the utilization of these tests, and is firmly convinced of their probative value, it cannot countenance the contention that the mere fact that they may be introduced if properly qualified is equivalent to actual compliance with the requirements for introduction.
THE RESULTS OF THE HLA TEST MAY NOT BE JUDICIALLY
NOTICED
Although petitioner’s counsel did not urge that the court take judicial notice of the HLA test results, the court is aware that the court in Carmen I. v Robert K. (110 Misc 2d 310) concluded that HLA test results could be the subject of judicial notice.
This court respectfully declines to follow that holding since it believes that HLA test results fall outside the ambit of matters that may be judicially noticed.
In order to ascertain whether HLA test results may be judicially noticed it is first necessary to examine just what that concept entails.
Judicial notice has been defined as “the knowledge which a judge will officially take of a fact, although no evidence to prove that fact has been introduced on trial” (Richardson, Evidence [Prince, 10th ed], § 8, p 6); “one of the legal expedients which makes it possible to assert a fact as true without the necessity for proof” (Fisch, New York Evidence [2d ed], § 1047, pp 590-591); matters which “will be taken for true by the tribunal without the need of evidence”. (9 Wigmore, Evidence [Chadbourn rev ed], § 2565, p 694.)[2]
*929 Under New York statutory law the scope of judicial notice is limited to judicial notice of law. (CPLR 4511.) Unless and until the Legislature adopts the proposed New York Code of Evidence, the parameters of judicial notice of fact remain governed by decisional law.* [3] Matters of fact are generally divided into adjudicative facts and legislative facts. The latter relates to matters considered by the court when it is creating law or policy.
Adjudicative facts are facts to which the law is applied in the process of adjudication. They relate to the parties, their activities and their businesses.[4]
In order for the court to take judicial notice of the results of the HLA test it would have to conclude that the test results are so notorious that they are not subject to dispute by reasonable men, or capable of immediate accurate representation by reference to easily accessible sources of unimpeachable conclusiveness.
The court enthusiastically takes judicial notice of the principles underlying HLA testing, but does so because it may take notice of the law of New York by authority of CPLR 4511. The common law of this State requires that scientific tests be generally accepted as reliable within the scientific community, and section 532 of the Family Court Act necessarily represents a legislative determination of the validity of the principles underlying HLA testing.
The court, however, cannot take judicial notice of the results of the particular HLA test conducted in the instant matter.
There is a palpable distinction between judicial notice of the principles underlying a scientific test, and judicial notice of the results of a particular test. In order to reach *930 the latter conclusion the court would have to determine that: (1) each facet of the test has been correctly performed, (2) the findings have been accurately recorded, (3) the conclusions that flow from them have been correctly deduced, and (4) that the underlying statistical data upon which probabilities are based provide a valid basis for the results obtained.
Recognition of the distinction between general principles and test results permeates the decisions where this issue has arisen.
In Commissioner of Welfare of City of N. Y. v Costonie (277 App Div 90), the Appellate Division reversed a finding of paternity, and remanded for a new trial based on the failure of the trial court to give conclusive weight to the results of a BGT which excluded paternity.
The court qualified its mandate that conclusive effect be accorded the BGT with an observation that all the trial court had before it were filed unsworn reports and supposed results. It noted that the court lacked an opportunity to judge the methods adopted, the precautions taken to insure an accurate result, and the scientific basis for the indicated findings.
While acknowledging that it was common practice to introduce test results without calling the doctors who made them, the court noted (p 92) that the issue of “possible infirmity in the doctors’ procedure or conclusions * * * [were] of such importance both from the viewpoint of this case and future practice”. It suggested that testimony be adduced respecting the test procedure and the conclusions drawn.
Judge Shientag’s concurrence stated (pp 92-93):
“There should be no occasion for expert testimony in every case to prove the scientific validity of blood-grouping tests resulting in exclusion of paternity. The scientific opinion on that point is so general that courts may take judicial notice of it in filiation proceedings.
“The difficulty, however, is that there may be a margin of error in the making of the tests. Until it is otherwise provided by appropriate legislation, therefore, the burden is upon the defendant in a filiation proceeding of procuring *931 the test and of placing in evidence the report indicating the result of the test if that result definitely excludes his paternity. Moreover, if the complainant so demands, even when the result is one of exclusion, the defendant should also be required to produce the doctor who made the test, for cross-examination with respect to his competency and to the accuracy of the test made by him. To be sure, this may involve the expenditure of a substantial sum of money which in many or most instances would be prohibitive, but that is a legislative and an administrative problem, rather than a judicial one.” (Emphasis supplied.)
In Clark v Rysedorph (281 App Div 121) the court affirmed the dismissal of a filiation proceeding where three medical doctors gave uncontradicted testimony as to the exclusionary results of blood-grouping tests (BGT’s) conducted by them. The court found that the uncontradicted testimony of two doctors, based on immutable scientific laws, was conclusive.
In Matter of Lebowitz v Lebowitz (28 AD2d 721) the court stated that properly conducted blood tests must be given great weight; the trial court should have the proper medical witnesses before it if there is doubt on the issue.
The thrust of these decisions is clear. Even when dealing with ABO testing, a far less complex procedure than HLA testing, it is vital that the party opposing the introduction of a test have the opportunity to determine whether the testing procedure has been compromised by some margin of error.
It does not suffice to accept the cogency of a scientific principle. Scientific principles are conceptual and exist in the abstract. They are probative only when applied in the context of a particular situation.
There always exists the possibility of human error, and such error can taint the validity of the results obtained. It is therefore essential that the litigant adversely affected by the introduction of these tests have the right to subject its proponent to cross-examination in order to expose the flaw, if any, in the procedure.
If it is improper to take judicial notice of the discrete ABO test results, a fortiori it should not be done with respect to discrete HLA test results.
*932 The latter, while susceptible of excluding paternity in instances where ABO testing fails to do so, are intended to serve as affirmative evidence of paternity. However, the process does not end with determining the genotypes of the child, mother and putative father. Rather, it proceeds to a consideration of the probability that the halpotype common to the child and the putative father came from the putative father and not from a random man. The latter determination flows from reference to statistics regarding the frequency of a particular halpotype within the general population.
It should be evident that matters such as these do not fall within the ambit of those facts which are generally known, or capable of accurate and ready determination by references to authorities of unquestioned accuracy.[5] For this reason they cannot be judicially noticed.
Even if petitioner had successfully introduced the HLA test results, it is open to question whether she would have succeeded.
Given the numerous unexplained inconsistencies in her testimony and the absence of any competent credible objective evidence of respondent’s paternity, her petition must be dismissed.

. During the hiatus between the drafting of this opinion and its issuance the Governor signed into law on July 22, 1982, chapter 695 of the Laws of 1982 effective immediately. This chapter amended the Family Court Act and the CPLR to provide that BGT and HLA test results and reports may be received into evidence as prima facie evidence of the facts contained therein if properly certified and authenticated.
The salutary purpose of the bill might be frustrated through drafting oversight. While section 418 of the Family Court Act provides that an HLA test may be performed by a duly qualified physician or a laboratory duly approved for this purpose by the Commissioner of Health and section 532 of the Family Court Act provides that an HLA test may be performed by a duly qualified physician, CPLR 4518 was not concommitantly amended to authorize either a physician or a laboratory to certify or authenticate the test results. As a result, the results of tests performed by a physician or laboratory could not be admitted into evidence without the person who made the report present in court to qualify it, because neither a physician nor a designated laboratory official is empowered to make the requisite certification or authentication.
It is hoped that this omission will be rectified at the next legislative session.

. The cerebral approach taken by Prof. Chadbourn in his masterful revision of Prof. Wigmore’s Evidence in Trials at Common Law details the modern statutory evolution of *929 the concept of judicial notice with particular reference to the American Law Institute Code Rules (1942) and Uniform Rules of Evidence (1953) and the Federal Rules of Evidence (1975).

. The Law Revision Commission’s proposed Code of Evidence adopts the concept of judicial notice contained in the Federal Rules of Evidence, and provides in subdivision (b) of section 201 “Kinds of adjudicative facts which may be judicially noticed. To be judicially noticed, an adjudicative fact must be one not subject to reasonable dispute in that it is either: (1) generally known within the community where the trial court sits; or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.”

. Davis, Judicial Notice, 55 Col L Rev 945, 952.

. Chadbourn draws attention to the scholarly debate on the question of the effect of taking judicial notice with Thayer, Wigmore, and Davis viewing it as prima facie evidence susceptible of a dispute by the opponent, and the Morgan, McCormick opinion that it is conclusive. (9 Wigmore, Evidence [Chadbourn rev ed], §§ 2567, 2567a.)