*458 OPINION OF THE COURT
Fuchsberg, J.
In the main, this appeal requires us to consider the question, vital to the trial process, of the certainty with which the opinion of an expert witness — here a physician — must be expressed for it to have probative force.
The issue arises in a negligence suit emanating from a collision in early 1973 between a police car driven by plaintiff Lloyd Matott, a Deputy Sheriff of St. Lawrence County, and the defendants’ van. The plaintiff received a verdict at the hands of the jury, and the judgment entered thereon has since been affirmed by a closely divided Appellate Division.
Pertinent is the fact that Matott, who suffered orthopedic injuries in the impact, came under the care of an osteopathic physician, Dr. Lester Millard, who promptly embarked on a course of therapy that lasted for several months after the injuries were sustained. However, though Matott was to testify that he continued to experience pain and discomfort right up to the time of trial in 1977, he only visited the doctor intermittently in the intervening years. There was also proof that, on several of these occasions starting almost two years after the 1973 accident, he complained to Dr. Millard of new injuries to parts of his body affected by the original accident. Shortly before trial, the doctor conducted an examination to evaluate the residual condition. It is on Dr. Millard’s trial testimony that the controversy now focuses.
Specifically, it turns on a line of questioning initiated by plaintiff’s counsel to ascertain whether, in the doctor’s opinion, the condition he found following the later occurrences was related to the original accident "with a reasonable degree of medical certainty”. After an interruption to dispose of an objection as to foundation, the court, perhaps intending merely to repeat the unanswered question, nevertheless altered it to say, "And are you in a position, Doctor, to give us an opinion, with a degree of medical certainty, as to whether this condition that you saw at this time was related to the first accident?” Before the witness could reply, the Judge continued, "Now, think about that, Doctor, solely to the first accident and without any other accident intervening.” To all this the witness responded, "I don’t think I could say with certainty that it would be solely due to the accident of March, 1973”. (Emphasis ours.)
*459 Undaunted by this seemingly unresponsive answer, after some attempts to clarify the distinction among various gradations of medical certainty and a rereading of the phraseology employed by the Trial Judge, counsel for the plaintiff himself fell back on that pattern, asking this time "could [we] have a degree of medical certainty that this was * * * causally related?” (Emphasis ours.) The witness thereupon volunteered that he had mistakenly assumed the Judge’s earlier inquiry demanded absolute certainty, and he then proceeded to answer it, this time in the affirmative. Defense counsel registered no objection to the form of this testimony; indeed, his consent may be inferred from his earlier assumption that "there [is] no unreasonable degree of medical certainty”.
As to the doctor, he did have an opportunity to respond directly to a question phrased in terms of a "reasonable” degree of medical certainty. This was when the interrogation turned to prognosis. He then was unequivocal in asserting that, in his opinion, Matott’s condition was permanent.
It is this evidence that the two dissenters at the Appellate Division deemed insufficient to establish a causal relationship between the original accident and the physical disabilities of which the plaintiff still complained at the time of trial. While as one with the majority as to liability, they held to the view that the causal connection had to be established by testimony that bespoke "a reasonable degree of medical certainty” (66 AD2d 910). On this appeal, here pursuant to CPLR 5601, we reach a different conclusion.
Generally speaking, a predicate for the admission of expert testimony is that its subject matter involve information or questions beyond the ordinary knowledge and experience of the trier of the facts. Moreover, the expert should be possessed of the requisite skill, training, education, knowledge or experience from which it can be assumed that the information imparted or the opinion rendered is reliable. (McCormick, Evidence [2d ed], § 13; see, generally, § 10; Wigmore, Evidence, vol 2, §§ 555-567; vol 7, §§ 1917-1929; Richardson, Evidence [10th ed — Prince], §§ 366-368.)
There being no question but that the expert evidence was necessary and that the witness through whom it was provided in the present case was qualified, the court still had to ascertain whether, in opining as to causation and prognosis, Dr. Millard exhibited a degree of confidence in his conclusions sufficient to satisfy accepted standards of reliability. Granted *460 that "a reasonable degree of medical certainty” is one expression of such a standard and is therefore commonly employed by sophisticates for that purpose, it is not, however, the only way in which a level of certainty that meets the rule may be stated. For, an overview of New York case law reveals that the requirement is not to be satisfied by a single verbal straightjacket alone, but, rather, by any formulation from which it can be said that the witness’ "whole opinion” reflects an acceptable level of certainty (Martin, Uncertain Rule of Certainty, An Analysis and Proposal for a Federal Evidence Rule, 20 Wayne L Rev 781, 790). To be sure, this does not mean that the door is open to guess or surmise, and admittedly, "a degree of medical certainty”, taken literally and without more, could very well be so characterized.
Yet, the need for flexibility is apparent from even the briefest consideration of the nature of medical opinions. Training in the inexact and continually expanding science of medical investigation implants in its initiates a reluctance to quantify their judgments as to cause and effect. Except insofar as one inescapably affects the other, the primary function of the average physician is to diagnose and treat the condition at hand rather than to determine precisely what extraneous factors influenced it. The emphasis is on the effect on antecedent physiological and psychological conditions; medical histories are almost always chronicles of the patient rather than the accident.
On the other hand, the approach of the lawyer, tutored in the art of resolving social problems and focusing on "proximate cause”, "fault distribution” and the like, is quite different. In the identification of influences toward legal responsibility, his concern is whether tort and injury bear a close enough relationship to make it equitable to impose financial responsibility upon a defendant. Not only is this a matter usually dehors the medical profession’s interest, but the type of prognostication that enters into it is out of tune with its far more scientific orientation. Thus, making allowances for the tension inevitably produced by an attempt to compress medical thinking into verbal molds created by the law is completely sensible. (See, generally, Small, Gaffing, at a Thing Called Cause: Medico-Legal Conflicts in the Concept of Causation, 31 Tex L Rev 630; Markus, Semantics of Traumatic Causation, 12 Cleveland — Marshall L Rev 233, 242-244.)
As though recognizing this problem long before the expan *461 sion of modern medicine made it particularly acute, Turner v City of Newburgh (109 NY 301), while reaffirming the injunction that four years earlier had been issued against opinions as to consequences that were "contingent, speculative, or merely possible” (Strohm v New York, Lake Erie & Western R. R. Co., 96 NY 305, 306), upheld the admission of evidence that the injuries there "could have resulted from a fall”. The court went on to say that it saw no objection to an opinion "as to whether [plaintiff’s present] condition might have been caused by or be the result of a previous injury” (emphasis ours) (109 NY, at p 308). In doing so, it superseded Strohm’s apparent insistence on a strict "reasonable certainty” formula, relegating that standard to opinions as to the likelihood of the future outbreak of latent or new conditions not manifested at the time of trial, a matter we have no occasion to reappraise at this time.
These holdings have been the precursors for a whole train of similar determinations (see, e.g., Griswold v New York Cent. & Hudson Riv. R. R. Co., 115 NY 61, 64 ["probability” held proper formulation for inquiry as to likelihood of recovery]; Cross v City of Syracuse, 200 NY 393, 396-397 [doctor could "hardly answer” question as to prognosis "with reasonable certainty” but subsequent opinions admitted]; Knoll v Third Ave. R. R. Co., 46 App Div 527 [extent of injuries "likely” to increase in future held admissible]; Drollette v Kelly, 286 App Div 641 ["could” have caused present condition sufficient]; Green v Mower, 3 AD2d 788 [testimony that accident "could” have caused condition upheld]; McGrath v Irving, 24 AD2d 236, 238 [allowing "opinion” of what "was” cause of disease]; Matter of Brown v Highways Displays, 30 AD2d 892 [finding "could be”, "possibly was” and "probably was” adequate to establish condition as work-related]; Matter of Scherbner v Masmil Corp., 34 AD2d 1072 ["possible cause” and "could have a toxic effect” are permissible]; Peligri v CAT Serv. Corp., 36 Misc 2d 257 ["could be” a cause and "could be” and "it seems to be” permanent are acceptable]).
The rule that evolves appears to be the one well stated in Matter of Miller v National Cabinet Co. (8 NY2d 277, 282), where the court made clear that it is not a dictionary dilettantism that is to govern, but whether it is "reasonably apparent” that "the doctor intends to signify a probability supported by some rational basis”. (See, also, Matter of Ernest v Boggs Lake Estates, 12 NY2d 414, 416 [" 'it may be assumed *462 with all reasonable likelihood’ that the accident trauma 'could possibly have influenced adversely’ ” claimant’s tuberculosis], citing Sentilles v Inter-Caribbean Corp., 361 US 107, 109 ["probably”, "the most likely” cause].)
Looking then to substance rather than form, we cannot say that, on the whole record, Dr. Millard’s educated opinion that the tortious event caused plaintiffs subsequent medical condition was inadequate insofar as his answers adhered to the sterotypes in the questions formulated by Judge and lawyer. Further, allowing for the fact that the cause and effect relationship was one that, perhaps by its very nature, could not be established with scientific certainty, the reservations the doctor articulated by his other comments and responses can be seen as candid indications of the limitations inherent in medical opinion and, as such, a useful revelation to the jury in reaching its own conclusion as to the merits of the parties’ opposing contentions on causation and permanency (cf. Matter of Ernest v Boggs Lake Estates, supra, at p 416).
All the more is this so, since the doctor had played an intimate role in the medical history of the case. He was the treating physician. His was the advantage of a prompt postaccident examination. In the course of his repeated treatment, he had the opportunity to note the refinements and subtleties of his patient’s progress. He had personally observed the nature and extent of each of the exacerbating incidents in determining their effect on his diagnosis and treatment; he bore the responsibility for determining their relationship to the pre-existing symptoms. He had also undertaken a current medical survey on the eve of trial himself. In sum, if any one was in a position to hold an informed opinion, it was Dr. Millard.
The context out of which the disputed testimony arose also demonstrates its reliability. The colloquy in which Dr. Millard engaged anent his original misunderstanding of the Judge’s question was itself a graphic illustration of the problem faced by a physician called upon to pour his medical opinion into a legal crucible. And, his answer to the conventional "reasonable degree of medical certainty” question when queried as to permanency gave further indication of the implications of his earlier testimony. To this must be added the fact that he was not shaken in the least by defense counsel’s cross-examination.
In sum, we conclude that, considering the totality of his *463 testimony rather than focusing narrowly on single answers, Dr. Millard’s opinion, though not solicited or expressed in terms of the particular combination of magical words represented by the phrase "reasonable degree of medical certainty”, conveyed equivalent assurance that it was not based on either supposition or speculation.
Thus, consonant with a principle insistent only on substantive indication of reasonable reliability, the issue of causation was properly submitted to the jury and, therefore, the order of the Appellate Division should be affirmed.*
Chief Judge Cooke and Judges Jasen, Gabrielli, Jones, Wachtler and Meyer concur.
Order affirmed, with costs.

 In so concluding, we also note that, having considered the other issues raised by the defendant, we find them to be without merit.