OPINION OF THE COURT
Aileen Haas Schwartz, J.
C. P. Snow’s concept of two cultures appears applicable to the relationship between law and science. Between jurists at one pole and scientists at the other there may be equally “a gulf of mutual incomprehension.” Yet, this case illustrates their interdependence in fact and the efforts to bridge that gulf.
At stake here is the paternity of a child, the “creation of a parent-child relationship.” (Little v Streater, 452 US 1, 13.) The focal issue is the use of scientific evidence, namely, the results of serologic testing to determine the claim of paternity.
The background facts pose little difficulty. Petitioner portrayed a long-term relationship commencing with a *835 chance meeting at a gathering in 1974, a second meeting in 1978, and later marked by flowers, shared interests and celebrations until announcement of the pregnancy in June, 1980 and her subsequent refusal to abide by respondent’s “decision,” in the interest of his career, to have the pregnancy terminated. Their relationship became intimate in May, 1979, with a pattern of sexual intercourse at petitioner’s apartment, and of particular pertinence, at a hotel in Puerto Rico, where respondent was attending a convention, on or about May 21,1980. The child was born February 7, 1981. Respondent renewed their relationship about one month after the child’s birth and continued it until September, 1981. Now 35 years of age petitioner testified that respondent is the only individual with whom she has had sexual intercourse.
Respondent did not testify to refute the allegation of paternity. Rather did he challenge the admissibility of written reports and testimony of composite blood-grouping tests (red blood cell [RBCJ and human leucocyte antigen blood tissue [HLA] tests) performed pursuant to court directive (Turret, J.) in accordance with subdivision (a) of section 532 of the Family Court Act. That challenge gave rise to two principal questions:
(1) Does the admissibility of the results of the human leucocyte antigen blood tissue test (and other blood-grouping test) “to aid in the determination of whether the alleged father is or is not the father” (Family Ct Act, § 532, subd [a]), violate standards of due process when applied to members of the “Hispanic population”?
(2) Does subdivision (a) of section 532 of the Family Court Act permit the evidentiary use of the results of blood-grouping tests other than the HLA test in conjunction with and in addition to the results of the HLA test “to aid in the determination of whether the alleged father is or is not the father”?
Recent statutory and decisional developments to enhance the accuracy of fact finding in disputed parentage cases present a classic example of the law’s reliance upon science. Juxtaposed with the increasing social phenomenon of the nonmarital “family” and the newly won constitutional status of the out-of-wedlock child is the inherent *836 partiality of the usual witness, the petitioner. Not even the decisional response to the problem of “charges easily made” by requiring a clear and convincing standard of proof of the petitioner allays concerns for the important interests at stake. (Matter of Gray v Rose, 30 AD2d 138, 140, citing Burke v Burpo, 75 Hun 568, 570.)
Prior to 1981, New York statutory law stringently limited the admission of the results of blood-grouping tests to “cases where definite exclusion is established.” (Family Ct Act, former § 532.) Subdivision (a) of section 532 of the Family Court Act now provides: “The court shall advise the parties of their right to a blood test and, on motion of any party, shall order the mother, her child and the alleged father to submit to one or more blood grouping tests by a duly qualified physician to determine whether or not the alleged father can be excluded as being the father of the child, and the results of such tests may be received in evidence but only in cases where definite exclusion is established. However, the results of the human leucocyte antigen blood tissue test may be received in evidence to aid in the determination of whether the alleged father is or is not the father except in cases where exclusion has already been established by other blood grouping tests.” Subdivision (b) of section 532 of the Family Court Act further provides that a “report” may be received in evidence pursuant to CPLR 4518. There is no legislative prescription for the form or composition of “the results” of such report, nor is there guidance to be gleaned from legislative history. CPLR 4518 (subd [c])[2] does state that reports pursuant to section 532 admitted into evidence in accordance with CPLR 4518 “are prima facie evidence of the facts contained”.
The instant written “report” of Leon N. Sussman, M.D., F.A.C.P., a leading expert in the field of serologic testing, *837 contains two explicitly delineated parts: (1) The results of the blood-grouping tests (RBC and HLA) and (2) “Explanations.” The first part is further divided into two sections: (1) Separate RBC and HLA identification of the phenotypes of the mother, child and respondent and (2) the statement, “There are no contradictions of the laws of theoretical expectancy, paternity therefore cannot be excluded.” The second part is headed, “Explanations” and states, as follows:
“Calculations of Plausibility of Paternity
“Combined Paternity (RBC & HLA) Index (P.I.) = 246 (odds)
“Plausibility of Paternity (W) = 99.9%
“According to Hummels Predicates, paternity is ‘practically proved.’ ”
Although not a legislative formulation, the medical expert’s instant and standard report, in format and substance, adopts the recommendations of the Joint AMA-ABA Guidelines: Present Status of Serologic Testing in Problems of Disputed Parentage (10 Family LQ 247, 282 [hereinafter Joint AMA-ABA Study]). The Joint AMA-ABA Study represents a five-year close collaboration between members of the medical and legal professions with the primary purposes of providing a “definition of the current state of capabilities” of serologic testing in problems of disputed parentage and “a measure of certainty * * * as to what has become scientific fact and what remains hypothesis”. (Id., p 248.)
While distinguishing scientific fact from hypothesis, the Joint AM A-ABA Study does not advocate rejection of the latter. The Joint AMA-ABA Study states that “[fjive types of equally acceptable and definite exclusion of a non-father are possible”. (10 Family LQ, at p 259.) Exclusion of paternity (and maternity) is classified as scientific fact. (10 Family LQ, at pp 259-260.) “In order to increase the utility of serologic testing,” the Joint AMA-ABA Study then reasons (id., at p 260), “it is desirable to estimate the likelihood of paternity in cases when the putative father is not excluded.” The recommended method for calculation of the likelihood of paternity is a formula (using the gene fre *838 quencies in a given population) “based on a comparison of the putative father with one non-excluded random man who is presumed to have had equal access to the mother.” (Id., at p 262.)
Legal commentators have raised serious questions regarding the adoption of mathematical methodology (probabilistic evidence) to prove and to adjudicate disputed facts, i.e., “trial by mathematics.” (Tribe, Trial By Mathematics: Precision and Ritual in the Legal Process, 84 Harv L Rev 1329; see Ellman and Kaye, Probabilities and Proof: Can HLA and Blood Group Testing Prove Paternity, 54 NYUL Rev 1131; Finkelstein and Fairley, A Bayesian Approach to Identification Evidence, 83 Harv L Rev 489; Tribe, Trial by Mathematics: Precision and Ritual in the Legal Process, 84 Harv L Rev 1329; Finkelstein and Fairley, A Comment on “Trial By Mathematics”, 84 Harv L Rev 1801; Tribe, A Further Critique of Mathematical Proof, 84 Harv L Rev 1810.) Indeed, even the Joint AMA-ABA Study cautions (10 Family LQ, at p 263), that “appropriate safeguards need be developed to guard against possible misinterpretation of calculations of likelihood of paternity.’ ” Dr. Suss-man also testified to the imperfections of the empirical data, to wit, the tables of gene frequencies for given populations, that constitute a major factor in calculating the likelihood of paternity.
Those conceded imperfections may be acceptable in statistical analysis of the average distribution of a defined characteristic in a given population. Respondent argues that such “imperfections” in the tables of gene frequencies amount to departures from accuracy of such magnitude in the case of the Hispanic population as to render evidentiary use of the results of blood-grouping tests (other than to establish definite exclusion) violative of due process. Hence the challenge to the constitutionality of the part of subdivision (a) of section 532 of the Family Court Act that authorizes such evidentiary use.
In support of the due process contention, respondent places greatest reliance on Dr. Sussman’s testimony in Matter of Alicia C. v Evaristo G. (115 Misc 2d 564, 566): “ ‘We’re having our greatest difficulty with the Hispanic population, and the reason why is because the Hispanic *839 population is very, very mixed. It consists of Indian, Spanish, black and white. So it’s impossible to get a single table that will give us a leeway in judging the frequency of certain factors in a group that is so mixed. So we arbitrarily pick a black or white standard and use it. You could not combine the two tables and come up with an honest calculation.’ ” Judge Fogarty found the HLA results were not based on reliable information and thus not admissible, reasoning, “A plausibility of paternity of 98.5% (very likely) cannot be accepted when use of a possible different chart would produce a 54% probability.” (Supra, p 567.)
Initially, it is noted that the order in Matter of Alicia C. (supra), was reversed by the Appellate Division, Second Department (93 AD2d 820, 821), which stated cryptically, “With respect to the admissibility of the results of the human leucocyte antigen blood test, the Legislature has determined that the results of that test are sufficiently reliable to ‘be received in evidence to aid in the determination of whether the alleged father is or is not the father’ (see Family Ct Act, § 532, subd [a]). The Family Court’s observation * * * goes to the weight, but not the admissibility of that evidence (see Matott v Ward, 48 NY2d 455, 462).” Additionally, Dr. Sussman testified in the instant matter that the subject calculations were based upon a table of gene frequencies for Hispanics compiled by “his laboratory” subsequent to “Judge Fogarty’s decision.” Dr. Sussman further testified that calculations were performed assuming the petitioner, child and respondent “were Hispanics”, “assuming they were Black” and “assuming they were White”, and that the three calculations of plausibility of paternity produced the same number.
The focus of respondent’s challenge overlooks the real significance of blood-grouping tests, particularly the HLA test.
A blood test exclusion of paternity is universally accepted by the scientific community. “ ‘[Tjhere is now * * * practically universal and unanimous judicial willingness to give decisive and controlling evidentiary weight to a blood test exclusion of paternity.’ S. Schatkin, Disputed Paternity Proceedings § 9.13 (1975).” (Little v Streater, 452 US 1, 7, supra.) Indeed, the Supreme Court in Little v *840 Streater (452 US 1, 16), held that a statutory cost requirement for blood-grouping tests in a paternity case deprived an indigent defendant of “ ‘meaningful opportunity to be heard’ ” and hence violated the due process guarantee of the Fourteenth Amendment. “[B]ecause of its recognized capacity to definitively exclude a high percentage of falsely accused putative fathers,” the Supreme Court reasoned, “the availability of scientific blood test evidence clearly would be a valuable procedural safeguard in such cases.” (Supra, p 14.) Little v Streater (452 US, at pp 7-8), expressly relied upon the above-mentioned “1976 report developed jointly by the American Bar Association and the American Medical Association” for confirmation of the ability of blood-grouping tests to exonerate a very high percentage of falsely accused defendants in paternity cases. The Supreme Court noted findings in the report that seven blood test systems — ABO, Rh, MNSs, Kell, Duffy, Kidd, and HLA — provided “a 91% cumulative probability of negating paternity for erroneously accused Negro men and 93 % for white men” and then concluded, “The effectiveness of the seven systems attests the probative value of blood test evidence in paternity cases.” (Supra, p 8.)
Subdivision (a) of section 532 thus reflects scientific and jurisprudential developments attesting to the reliability of serologic testing in cases of disputed parentage. The New York Legislature formulated a distinctive evidentiary scheme. The statute prescribes court-ordered blood-grouping tests, without restriction as to number and test system, and the admissibility of the results of any such test “but only in cases where definite exclusion is established.” “However,” the statute continues, “the results of the human leucocyte antigen blood tissue test may be received in evidence to aid in the determination of whether the alleged father is or is not the father except in cases where exclusion has already been established by other blood grouping tests.” The legislative language is clear. Only the results of the HLA test are outside the purview of the statutory proscription against use of test results other than to establish definite exclusion. The statutory special regard for the HLA test is consistent with the Joint AM A-ABA Study conclusion that “[t]he number of antigens in the system *841 * * * makes it apparent that the HLA typing system offers the single most potent method for exclusion.” (10 Family LQ, at p 274.)
A more expansive interpretation permitting use of results of other blood-grouping tests but only in conjunction with and in addition to HLA tests to determine whether the alleged father is or is not the father is possible. Legislative competence to enact such evidentiary use of results of blood-grouping tests appears beyond question. Indeed, such enactment would comport with the Joint AMA-ABA Study recommendations and enhance the probative quality of the scientific evidence to aid in determination of whether the alleged father is- or is not the father. Manifestly, the Legislature has already accepted the reliability of such serologic testing for purposes of definite exclusion. Indeed, to proscribe the evidentiary use of blood-grouping tests to establish definite exclusion would constitute a due process violation. (Little v Streater, supra.) “Obviously,” the Supreme Court recognized in Little v Streater (452 US, at p 13), “both the child and the defendant in a paternity action have a compelling interest in the accuracy of such a determination.” However, although the Supreme Court has recently noted the advances in blood testing as a consideration in concluding that a two-year Statute of Limitations in paternity proceedings deprived out-of-wedlock children of equal protection (Picket v Brown, 462 US _, 51 USLW 4655) the Supreme Court has not held that due process requires admissibility of blood test results of “non-exclusion” to aid to determine paternity.
The decision regarding the admissibility of the “non-exclusion” results of blood tests in paternity proceedings falls within the province of the Legislature. The proper judicial role is to accept the plain letter of the statute and to engage in a continuing dialogue with the Legislature, particularly during this experimental period.
Consonant with the foregoing, only the results of the HLA test may be received in evidence, pursuant to subdivision (a) of section 532 of the Family Court Act to determine whether respondent is or is not the father. Respondent’s challenge to subdivision (a) of section 532 will be so viewed.
*842 Although framed as a due process challenge to subdivision (a) of section 532, respondent does not really question the scientific findings that application of Mendel’s laws of inheritance to the results of serologic testing can scientifically exclude paternity and that the present capability of the HLA system provides a significant (whatever the precise figure for a specific classification) probability of exclusion of the erroneously accused individual. Thus, respondent does not attack the reliability of the “results” of the serologic testing, i.e., (1) identification of the phenotypes of the mother, child and respondent and (2) “There are no contradictions to the laws of theoretical expectancy, paternity therefore cannot be excluded.” Moreover, challenge to the admissibility of the HLA test pursuant to subdivision (a) of section 532 must be evaluated within the context of the statutory unrestricted prescription for blood-grouping tests to establish definite exclusion. Rather does respondent oppose that part of the “report” labeled “Explanations” which translates the “results” through mathematical formulae to a percentage “Plausibility of Paternity” and through use of Hummel’s Verbal Predicates to verbalization of such percentage to the words, “practically proved.”
Further analysis of respondent’s arguments leads to the further refinement that respondent does not really object to the expert’s adoption of mathematical formulae of probability or of the Hummel’s Predicates per se but only as applied to members of the “Hispanic population.” More precisely, respondent disputes the accuracy of the table of gene frequencies compiled and utilized by the medical expert as a component factor of the computation of plausibility or likelihood of paternity and the applicability of Hummel’s Predicates because the “data of Hummel(5) are for gene frequencies for Caucasians in Germany.” (Joint AMA-ABA Study, 10 Family LQ, at p 262.)
Scientific evidence serves the law’s commitment to objectivity and accuracy in adjudication. Yet, human limitations even in scientific inquiries require an evidentiary standard of reliability, not absolute certainty, to test admissibility. (See Matott v Ward, 48 NY2d 455, 459.) Nor does the law adhere to a “dictionary dilettantism” to gov *843 ern the form of expert opinion. (Supra, p 461.) The substantive content of Dr. Sussman’s explanation of the results of the serologic tests adopts the presentation recommended by the Joint AMA-ABA Study. There are medical underpinnings to the mathematical techniques in computing the plausibility of paternity, but such computation does not transform medical hypothesis into medical fact. The age of computers has not rendered epistemology archaic.
The medical expert’s use of probabilistic formulae to explain the import of the two-pronged results of the serologic testing does not cure the admitted weaknesses of the empirical data of gene frequencies. Those weaknesses, however, reflect the heterogeneous nature of virtually all population groups. The Joint AMA-ABA Study recognizes a less than 100% accuracy of its statistical tabulations. By definition, the tables contained therein represent “mean probabilities” or “average distributions.” Evaluation of the medical expert’s explanation of the import of the results of serologic testing must take into consideration the nature and hence limitations of (a) the formulae utilized and (b) the component statistical data.
Neither those limitations nor anything else presented by respondent meets the burden of successful challenge to the constitutionality of legislation. (See I.L.F.Y. Co. v Temporary State Housing Rent Comm., 10 NY2d 263, 269.)
As Dr. Sussman testified in this case, the definition of a “report” pursuant to CPLR 4518 need not be determined. (See McCormick, Evidence [2d ed], § 211, p 517.)
Within the context of jurisprudential and scientific developments, the expert witness’ adoption of the mathematical formulae recommended by the Joint AMA-ABA Study (albeit only a part of the recommendations) to explain the scientific results of the HLA test comports with subdivision (a) of section 532 and accepted standards of reliability. (Matott v Ward, 48 NY2d, at p 459, supra.) Such testimony thus meets the standard of admissibility. Inasmuch, however, as the expert witness’ computations included the results of tests other than the HLA test, neither the paternity index nor the plausibility of paternity percentage is admissible. As a consequence, of course, the *844 application of Hummel’s Predicates is also rendered inadmissible.
The probative force of the HLA test is the scientific result that “[t]here are no contradictions to the laws of theoretical expectancy, paternity therefore cannot be excluded.” Suffice it to say, exclusion by virtue of further extended testing is not ruled out.
Petitioner’s evidence, including (and even excluding) that scientific evidence, meets the required standard of proof for adjudication of paternity. That “burden is to establish paternity by ‘clear and convincing’ evidence, evidence which is ‘entirely satisfactory’ and creates a genuine belief that respondent is the father of the child”, see (Matter of Commissioner of Social Servs. v Philip De G., 59 NY2d 137, 141-142.) The mother’s testimony, as set forth above, is found to be truthful. Only the mother, her brother, who testified primarily to respondent’s presence at the mother’s apartment, and Dr. Sussman testified. Most recently, on June 9, 1983, the Court of Appeals clarified the evidentiary consequences of the failure to testify on the part of a respondent in a paternity proceeding. “The failure of respondent to testify does not permit the trier of the fact to speculate about what his testimony might have been nor does it require an adverse inference. It does, however, allow the trier of fact to draw the strongest inference against him that the opposing evidence in the record permits”. (Matter of Commissioner of Social Servs. v Philip De G., supra, p 141.) Such inference is drawn as particularly appropriate in light of the quality of the relationship portrayed by petitioner and her testimony that respondent is the only person with whom she has had sexual intercourse.
Nor does respondent’s challenge to adjudication of paternity upon the ground that he “chose” to have the pregnancy terminated warrant more than reference to Matter of L. Pamela P. v Frank S. (59 NY2d 1), and Matter of Inez M. v Nathan G. (114 Misc 2d 282).
Order of filiation entered.

. “(c) Other records. All records, writings and other things referred to in sections 2306, 2307 and any record and report relating to the administering and analysis of a blood grouping test or human leucocyte antigen test administered pursuant to sections four hundred eighteen and five hundred thirty-two of the family court act are admissible in evidence under this rule and are prima facie evidence of the facts contained, provided they bear a certification or authentication by the head of the hospital, laboratory, library, department or bureau of a municipal corporation or of the state, or by an employee delegated for that purpose or by a qualified physician.” (CPLR 4518, subd [c]; emphasis added.)