OPINION OF THE COURT
Stanley Gartenstein, J.
In the face of almost overwhelming acceptance of the so-called HLA (human leucocyte antigen)[1] and other blood tests now mandated in filiation proceedings,[2] the disturbing question presented in this protracted litigation was bound to arise sooner or later. Paraphrased: In a paternity proceeding, where a Judge has carefully heard and weighed the evidence and has concluded that a petitioner’s case is utterly devoid of merit, must this conclusion, representing an application of the aggregate skills and instincts of a trained jurist and the evolution of the judicial process over centuries of trial and error yield to the result of a laboratory test which flatly contradicts it? Paraphrased still *647 further in the provocative title used by the author of a recent article in the Brooklyn Bar Association Barrister, HLA Paternity Testing: Who Needs Family Court Judges? (Brooklyn Barrister, No. 143).
Translated with specificity to the proceedings now before us, the issue herein involves a petitioner who, the court concludes cannot differentiate between fact and fiction, and whose testimony strongly suggests that it and other evidence was tailored specifically for this proceeding, as against the results of an HLA blood test which purport to establish respondent as the father of the subject child by a 99.7% plausibility of paternity.
Because of an inchoate malaise harbored increasingly over the years by the undersigned and numbers of his colleagues, unarticulated because this test is rarely challenged directly, the crystallization of this issue takes on major significance requiring reference to the underlying concepts at length.
Realizing full well that no degree of expert testimony can by itself impart to a court’s holding that degree of expertise in medicine or statistics, or in their interface, which a definitive study would require, the court nevertheless believes it essential to make in-depth reference to the underlying medical and statistical concepts in the belief that, faced with a legislative enactment, the “properjudicial role is to accept the plain letter of the statute and to engage in a continuing dialogue with the Legislature, particularly during this experimental period” (Matter of Smith v Jones, 120 Misc 2d 834, 841). This dialogue is made especially appropriate by the potential injustice caused by hundreds, possibly thousands, of men across the State who admit paternity relying on the results of this test; courts which too often accept its results without reference to its hidden flaws;[3] and, in the final analysis, a Legislature which has mandated its use possibly without awareness of these flaws.
the facts:
The within filiation proceeding to declare respondent the father of the infant Alexis D. was commenced on June 19,1983, nine months after her birth. At the protracted trial before the undersigned, petitioner testified that the subject infant was born on September 27, 1982, as a result of a sexual liaison with respondent on January 11, 1982. The relationship between the *648 parties began when petitioner met respondent, an accountant, at a time when they were both working in different capacities for the same accounting firm. After their initial meeting, a relationship ensued as a result of her overtures. This friendship included regular sexual intimacy which took place at respondent’s apartment. Petitioner admitted that respondent terminated the relationship in June, 1981. Nevertheless, she claimed continued sporadic sexual relations with him until February 11, 1982. Petitioner also admitted regular sexual encounters with four other men between June, 1981 and February, 1982, yet denied intercourse with any male other than respondent during the critical period, December, 1981 through February 11, 1982. Petitioner’s specific claim was that she and respondent had sexual intercourse on January 11,1982; that her last menstrual period was January 2-5, 1982; and that the subject infant was born as a result of this encounter.
To bolster her testimony, petitioner introduced her diary for the period in question which was received in evidence without objection. The entries therein tell more about petitioner than about her relationship with respondent.^ A partial list of sex partners for this limited period as culled from the diary includes the following impressive array: Larry W., Alfredo V., Darryl H., Tony P., and James C. — not to mention one Charles W., with whom she shared an apartment and who she falsely listed as her husband (and the father of her three nonexistent children) on an apparently perjured application for employment-related benefits. Not only did petitioner keep a chronicle of her adventures (incomplete, by her own account) but the listings therein also utilize a rating system which evaluates the sexual prowess of each sex partner. On July 2,1981, Darryl H. was rated “The best yet!” The following week, speaking of Larry W., the diary informs us that “The earth moved!!!” Interestingly, on the very day that Darryl H.’s performance was rated “The best yet,” petitioner confides to her diary her apparently irresistible attraction for yet another man, one Larry W., about whom she warns herself “If I had any sense at all I’d leave this man alone.”
But she didn’t. Petitioner’s diary documents a relationship with this same Larry W., through and including January 26, 1982, in spite of denials thereof under oath. Moreover, the record further establishes that petitioner was in fact living with said Larry W., through February 22, 1982, at which time her diary establishes that she moved away into her own apartment. It is to be noted that the date of conception herein, January 11, 1982, was at a time when petitioner was still living with said Larry W., without benefit of clergy.
*649 In her demeanor on the witness stand and in the courtroom during the trial, petitioner’s demonstrated instability of temperament caused the court to admonish her on more than one occasion. She is currently under psychiatric treatment for emotional instability. When asked about her alleged use of mind distorting drugs, petitioner invoked her privilege against self incrimination. Her appearance in court was often glassy-eyed and furtive. Her exaggerated sense of the dramatic produced a contradiction concerning sexual encounters between the parties as regards the limited listing in the bill of particulars compared with her claims on the witness stand of sex with respondent on “hundreds” of occasions.
Nor was petitioner’s credibility improved by other evidence. In her sworn petition, she alleged a course of sexual relations with respondent commencing on October 22, 1980, and ending on January 20, 1982, flatly contradicting her own testimony which fixed the last act of intercourse as February 11, 1982.
Turning again to petitioner’s diaries, it is significant to note that for each and every occasion on which respondent’s name appears after June, 1981, the date when he broke off this relationship, it is in fact the very last entry for that particular date. Even more telling is the fact that her diary entry for August 3, 1981, already filled with a prior notation, squeezes respondent’s name in sideways. The inference that these entries were made after the fact and in anticipation of litigation appears to be more than justified.
Further comparison of the diary with the bill of particulars leads to another interesting observation. The bill of particulars in listing dates of claimed intercourse between the parties employs an asterisk to denote those dates wherein it is also claimed that respondent was listed in the diary. Conspicuously absent from this delineation (i.e., containing no asterisk in the bill of particulars) are the crucial dates of January 11,1982, and February 11, 1982, again giving rise to a justifiable inference that these, possibly all entries — were fabricated specifically for this litigation.
Respondent testified in his own defense. He confirmed a relationship with petitioner until June, 1981, but categorically denied any physical contact with her thereafter. He admits an innocuous contact with petitioner in January, 1982, in which he met her outside his place of employment for the purpose of lending her $300 for what she claimed to be “personal reasons”. He denied sexual intercourse with her on that occasion or at any time subsequent to the date when he terminated their relationship in June, 1981.
*650 In assessing credibility, a trial court which has seen the parties first hand is in an enviable position unattainable by any appellate court which has before it a lifeless transcript. To the court, the most dramatic moment in this protracted trial came during the testimony of Roxanne C., called as a witness by petitioner. On cross-examination, Ms. C. testified that in June, 1981, fully seven months before the conception of the child in issue, respondent had not only broken off this relationship with petitioner, but that petitioner had phoned her (C.), hysterically, seeking (unsuccessfully) her intervention with respondent to have him change his mind about not seeing her again. Not only is this testimony conclusive upon petitioner who called this witness, thereby vouching for her credibility, but its impact upon the atmosphere in the courtroom — on petitioner and her counsel, to the extent of an audible gasp, was the single most telling blow of these adversary proceedings.
As these and other contradictions mounted up, the court was reluctantly compelled to draw inevitable conclusions about petitioner’s credibility. We assess her testimony to be a confused mixture of quasi facts and total fiction from which it is impossible to ascertain where truth begins and fantasy ends.
Having thus assessed credibility — or lack of it — the court is left with the results of the HLA test. These comprise the only positive aspect of petitioner’s case. Can a petitioner whose case is otherwise totally bankrupt satisfy her heavy burden of proof solely with the results of the HLA test? It is this issue which requires in-depth analysis.
THE HLA TEST:
The utilization of blood tests in paternity proceedings first sanctioned in this State in 1962 (L 1962, ch 686; Family Ct Act, § 532) has received such widespread acceptance that a State’s failure to make available their exclusionary aspects without a statutory cost requirement to an indigent respondent has been struck down as a denial of constitutional guarantees of due process (Little v Streater, 452 US 1).
The classic exclusionary test referred to by predecessor statutes and stare decisis as the blood-grouping test (BGT) is known in scientific circles as the Landsteiner test. Its methodology is based upon a testing of the red blood cells. The only scientific claim ever made for the Landsteiner test was a definitive exclusion for the 60% of excludable males who were in fact excluded by it. (Matter of Department of Social Servs. v Thomas J. S., 100 AD2d 119.) While scientific reliability for this test, for the 60% of excludable males in fact excluded by it, has been recognized *651 by our highest court (cf. Little v Streater, supra),[4] three important conclusions did not flow from its raw data: First, that all putative fathers not so excluded were inferentially included; second, that all males who might be excluded by any test whatsoever were in fact excluded by this test; third that the results of this test had any credibility as positive evidence of paternity. In the wake of these simple scientific truisms, the predecessor statute mandated admissibility of the Landsteiner test only if it excluded a tested respondent (cf. Family Ct Act, former § 532, prior to amdt by L 1981, ch 9).
In recent years, a medical test procedure first developed to measure the body’s rejection propensity toward a transplanted organ became an accepted measuring rod of paternity. In comparison to the Landsteiner test which still left a 40% residual possibility that an individual not excluded by it could still be reliably excluded by other means, this new procedure known as the HLA test and based upon tissue typing of white blood cells, involved a greater number of variables thus yielding a claimed accuracy rate of 95% (Matter of Department of Social Servs, v Thomas J. S., supra).
Paraphrased: Because the HLA test now claimed to exclude some 95% of those men who were in fact medically excludable by any means, this negative test which (presumably) approached the optimum goal of 100% accuracy was, allegedly, so accurate in reverse that it should now be accepted as positive evidence of paternity. This in spite of the fact that no claims were ever made, even by its most enthusiastic proponents, that HLA results carried even an infinitesimal rate of accuracy in positively proving paternity.
Instead of positive reliability in establishing paternity to correspond even roughly to these definitive exclusions (60% for Landsteiner test; 95% for HLA test), mathematical probabilities corresponding to betting odds were computed for the HLA test. These odds, known as the so-called “probability” or “plausibility” of paternity were further interpreted by the so-called “Hummel’s predicate,”[4]
[5] an impressive title for a statistical analysis *652 which, to use an extreme but highly relevant analogy, roughly corresponded to a form chart for pari-mutuel horse racing.
Statutory authorization for utilizing the HLA test may be found in the amended version of section 532 of the Family Court Act, effective March 2, 1981.[6] The average litigant, attorney or Judge is confronted with results of an HLA test together with a reading of the “probability of paternity” and of “Hummel’s predicate” which purport to quote the odds in favor of the tested individual’s paternity. What is too often obscured by the blind faith placed in these figures is the fact that nowhere in this statute (nor in its legislative history) is “Hummel’s predicate” or the “probability of paternity” as opposed to the HLA test itself, made an indicator of paternity. While results of an HLA test are now admissible as positive proof of paternity for such weight as the court may give them (Matter of Smith v Jones, 120 Misc 2d 834, supra), nowhere does any statute mandate admissibility (let alone weight) of these gratuitous odds. (Cf. Matter of Smith v Jones, supra, in which Hummel’s predicate, as opposed to test results proper, was excluded.)
Respondent’s incisive cross-examination of Dr. Leon Sussman, leading proponent of the HLA test, has substantially dissipated the prevailing mystique surrounding the HLA test. Preliminarily, it is in order for the court to afford great weight to the testimony of Dr. Sussman who was called as an expert by petitioner, and whose testimony is binding upon her. Dr. Suss-man was emphatic in stating that HLA test results did not, could not, positively state that respondent or anyone else was the father of petitioner’s child. This testimony was consistent with an article written by him in the March, 1981, New York State Journal of Medicine in which he stated:
“The temptation to use a mathematical formula for calculating the probability of paternity in cases where an exclusion is not obtained, is very great. There is, however, the risk of undue influence on the court when a report of ‘95 percent or higher probability paternity’ is presented.
*653 “Even at the 95 percent level, the fact is that a 5 percent chance of non-paternity exists. The circumstances that should be considered, such as access, time, multiple exposures, promiscuity, and so forth must be given their proper weight in arriving at a conclusion when the ‘probability of paternity’ is presented”.
The bottom line is that the HLA test, in contradistinction to a procedure yielding definitive results* is rather an impersonal analysis which, by its very nature, cannot mesh with the factual underpinnings of each individual case. To illustrate this point, Dr. Sussman acknowledged on cross-examination that Dr. Alexander Weiner, his mentor, had conducted blood tests in contested litigation where the mother of the infant in issue had been having sexual intercourse with two men. HLA testing of the first man conjectured a 99.7% plausibility of paternity, results which were reported to the court, and in turn presumably formed the basis of an adjudication of paternity against the accused putative father. Because of procedural facts peculiar to that case, the second male was tested years later. His test results yielded an even higher probability of paternity, viz., 99.8%. In litigation where so much is at stake, the possibility of a miscarriage of justice such as that just illustrated is simply intolerable.
In an article entitled: Paternity Blood Grouping Tests Using Legally Unaccepted Testing System (69 Amer J of Clinical Pathology 649) the very same Dr. Sussman wrote: “To further destroy the infallibility of blood grouping tests in matters of non-paternity, the erythrocyte enzyeme, blood protein in an HLA systems have not been subject to the thorough study and research that the 100% acceptable systems have undergone. All the probable variants, non-specificity of sera, influence of modifying genes and other facts are not known or clearly understood. Obviously, this unreliability can only lead to erroneous conclusions and grave miscarriage of justice. The misuse of the scarce momospecific HLA testing serum (previously reserved for pre-transplant selection of donors) makes this suggestion most impractical.” While Dr. Sussman testified that sera was now available for testing, thereby rendering part of his underlying comments academic, the other aspects thereof leading to unreliability remain unresolved. Indeed, no testimony was forthcoming to explain the possible effects of modifying genes or other unknown variants on HLA test results.
In a soundly reasoned law review article entitled: Trial By Mathematics: Precision and Ritual in the Legal Process (84 Harv L Rev 1329, 1334), Professor Tribe postulates that the *654 utility of mathematical models in the legal system must be viewed with suspicion: “ ‘[However], mathematics, a veritable sorcerer in our computerized society, while assisting the trier of fact in the search for truth, must not cast a spell over him.’ ”
Several law review articles have correctly perceived the very disturbing issue inherent in computerizing the fact-finding process, thereby in effect supplanting the Judge or jury, and have concluded that the HLA test should not be allowed as direct evidence of paternity. (Cf. Jaffe, Comment on the Judicial Use of HLA Paternity Test Results and Other Statistical Evidence: A Response to Terasaki, 17 J of Earn L 457; HLA Paternity Testing: Who Needs Family Court Judges?, Brooklyn Barrister, No. 143.) While the Legislature has mandated admissibility of HLA test results as affirmative evidence of paternity, a review of the many erudite studies justifies the important conclusion that undue weight which may be afforded to its results must not be allowed to prejudice the finder of facts. Further, these treatises are unanimous on the proposition that HLA test results should be used only to corroborate traditional evidence of paternity and should not serve in lieu thereof or in contradiction of traditional evidence.
Over and above these specific doubts concerning the HLA test, analysis of the testimony concerning statistical computations of “probability of paternity” yields the startling conclusion that the HLA test does not predict with any degree of certainty, that which it purports to do. To be sure, the medical foundation thereof, viz., its underlying hypothesis, appears to be universally accepted, that is — that human leucocyte antigens are measurable quantities, subject to an admitted possibility of human error in reading the microlymphocytoxicity colors and problems created because of nonspecific sera. Notwithstanding universal acceptance of this medical hypothesis, it is in the statistical analysis used to translate these accepted medical findings into a “probability of paternity” in which the basic weakness of this process may be perceived. As set forth in Dr. Sussman’s own article, HLA Grouping in Paternity Problems, the following steps are used to calculate plausibility of paternity subsequent to administration and reading of microlymphocytoxicity tests:
“(1) What are the genes derived from the mother?
“(2) What is the probability of the alleged father providing the obligatory genes (the genes necessary to complement the genes contributed by the mother) to produce the HLA phenotype in the child? This figure is X.
*655 “(3) What is the frequency of the obligatory genes in the general population of the ethnic group to which the father belongs? This figure is indicated Y.
“(4) The paternity Index = X/Y, and is a ratio between the probability of the alleged father providing the obligatory genes and the frequency of the obligatory genes in the general population. This ratio provides the ‘odds of paternity.’
“(5) The plausibility of paternity (W) is derived from the formula frwF
The first weakness inherent in the statistical process whereby “probability of paternity” is computed is the manner in which the frequency of the obligatory genes in the general population is computed. In the case at bar, which does not significantly differ from any other case, Dr. Sussman testified that the gene frequencies utilized in computing the odds of paternity were based upon tables derived from a data base assembled by taking 10,000 persons at random who happened to find themselves in a blood center in the northeast corridor for any purpose whatsoever (e.g., blood donors, persons tested for various illnesses, etc.) on a date chosen at random. When asked whether these persons were representative of the population of the northeast (i.e., black, Hispanic, Oriental, Italian, Irish, Jewish, etc.), Dr. Suss-man did not know, inasmuch as the data base did not take into account the ethnic and/or racial composite of the general population. It is first relevant to note the obvious flaw yielded by the fact that the ethnic composition of the subpopulation of the greater metropolitan area and that of the northeastern United States as a region, are radically different. In spite of this fact, it is significant to note that HLA results are specifically keyed into differences of the various ethnic groups. As set forth in the Joint AMA-ABA Guidelines: Present Status of Seriologic Testing in Problems of Disputed Parentage (10 Fam LQ 247, 276): “As in other genetic systems, HLA sometimes shows an unusually high association between antigens which constitute a single haploid. This is referred to as genetic dysequilibrium. Often such associations are very selective for certain ethnic groups or subpopulations within various geographic regions of the world. There is a considerable amount of data available on haplotype frequencies * * * However, even larger numbers of special groups must be typed to provide the statistical basis for analysis of their HLA inheritance. Even when all haplotype frequencies are known, the HLA typing laboratory will still require a determination of the racial and geographic origin of the subjects in order to calculate the probability of exclusion of paternity.”
*656 To illustrate: If persons of a particular ethnic group did not find themselves in blood banks in the same proportion as other ethnic groups on the date in question, then their genes, or more specifically, genes which may be more frequent to that particular ethnic group, were underrepresented in the data base sample. That being the case, when a person of that ethnic group would be accused of paternity, his HLA test result would be higher than it should be. Were it not a crucial fact that gene frequencies of ethnic groups form the very backbone of this statistical analysis (viz., “plausibility of paternity”), this fact might not be as damaging to its credibility as we find it to be. Since the data base against which respondent’s blood test results were compared in order to arrive at the so-called “plausibility of paternity” cannot reasonably be said to be consistent with the population of the metropolitan area (which differs from that of the northeast corridor) or, indeed, for that matter, even with the population of the northeast corridor itself, the evidentiary weight, if any, afforded the “plausibility of paternity”, viz., the betting odds, as opposed to the medical value of the HLA test itself, is significantly diminished, if nbt destroyed in toto.
Another significant factor in determining the unreliability of the interpretative part of the test is the fact that the so-called “Hummel’s predicate” which purports to translate the odds definitively was derived by Hummel in Germany from a Caucasian, Germanic and Nordic ethnic data base, and dealt with a totally different group of blood types and ethnic backgrounds than may be found in the population at large in New York. (Cf. similar Criticism in Joint AMA-ABA Guidelines, 10 Fam LQ 247, 262; Matter of Smith v Jones, 120 Misc 2d 834, 842, supra.) Even more puzzling to the court was Dr. Sussman’s admission on the witness stand that despite his enthusiastic advocacy on behalf of the HLA test whose results are always issued in conjunction with “Hummel’s predicate”, he had no idea of Hummel’s methodology other than his belief that Hummel was “universally accepted.”
Finally, in assessing the credibility of the HLA tests’ results, it must be borne in mind that according to Dr. Sussman’s testimony, even were the defects cited totally nonexistent, the best that could be said for a perfect score, viz., a mythical 100% “plausibility of paternity”, would be that it purportedly established the tested male as being 1 in every 300 males in the genéral population who might be the father of a particular infant in question. Thus, in a city of 8,000,000 persons such as New York, where presumably half the population is male, there *657 are 13,333.3 men who would, if tested, achieve a 100% plausibility of paternity. This margin of error is simply too great to allow the results of this test to render a Judge or jury obsolete. It obviously cannot reverse or nullify the findings of fact made after consideration of classic evidence received at the trial.
decision:
In a paternity proceeding, the burden is on the petitioner “to establish paternity by ‘clear and convincing’ evidence * * * which is ‘entirely satisfactory’ and creates a genuine belief that respondent is the father of the child” (Matter of Commissioner of Social Servs. [Patricia A.] v Philip De G., 59 NY2d 137,141-142).
The court finds, from all of the testimony and evidence before it, that this burden has not been met. Petitioner’s total lack of credibility is a fatal bar to her prevailing even under the lowest threshold standard of proof. She has failed to establish by any standard whatsoever that she had relations with respondent during the crucial period, or in fact, during any period subsequent to respondent’s decision to terminate the relationship fully seven months prior to the claimed date of conception. Clearly, the statute mandates admissibility of the HLA test to “aid in the determination” of whether the alleged father is or is not the father of the infant, as opposed to a nonexisting mandate to acceptance thereof in the face of overwhelming contrary evidence which totally negates paternity. The statute mandates admissibility as opposed to weight, conclusive or otherwise (Matter of Alicia C. v Evaristo G., 93 AD2d 820, supra). As Dr. Sussman himself concedes, in arriving at a determination of paternity, “the circumstances that should be considered such as access, time, multiple exposures, promiscuity and so forth, must be given their proper weight” (op. cit.). Given petitioner’s admitted promiscuity, her lack of credibility, and the finding that no act of intercourse occurred during the crucial time (cf. Matter of Commissioner of Social Servs. v Bart D., 121 Misc 2d 425), the petitioner has totally failed to meet her burden of proof.
Petition dismissed.
This determination is of necessity, dispositive of petitioner’s application for counsel fees which is denied.

. Cf. L 1981, ch 9.

. Cf. Matter of Pratt v Victor B., 112 Misc 2d 487; Matter of Alicia C. v Evaristo G., 93 AD2d 820; Matter of Bowling v Coney, 91 AD2d 1195; Matter of Kimiecik v Daryl E., 87 AD2d 284.

. Cf. Matter of La Croix v Deyo (113 Misc 2d 89, 91), in which the trial court placed such heavy reliance upon the results of the HLA test, that it mooted out any possible objection to the petitioning putative father’s testimony of relations with the deceased mother under CPLR 4519, based solely upon what it presumed to be “incontrovertible scientific evidence”.

. In Mills v Habluetzel (456 US 91, 98, n 4), the United States Supreme Court, in commenting on the excludability aspects of blood tests, as opposed to the new trend utilizing the HLA test to predict paternity, stated with regard to the latter that: “The proper evidentiary weight to be given to these techniques is still a matter of academic dispute”.

. Modified from Hummel, Ihm, Schmidt and Walliser, Biostatistical Opinion of Parentage Based on the Results of Blood Group Tests (Stutlgart, Gustav-Fischer Verlag, 1971) (cf. Matter of Pratt v Victor B., 112 Misc 2d 487, 489, n 1, supra).

. A recent amendment to section 532 of the Family Court Act now mandates admissibility of composite results of several blood tests as opposed to the single HLA test at issue here. The new statute mandates admissibility in all proceedings pending as of its effective date. In a posttrial motion, petitioner has moved for admission into evidence of these composite results, excluded by the court’s ruling during trial. This motion is denied. The time subsequent to cloture of the record and formal decision during which submissions on the law are awaited, cannot be deemed part of a pending proceeding. Moreover, were we of a mind to grant this motion, its effect would be academic inasmuch as we would receive composite blood test results in the same light as indicated by the comments herein concerning the single HLA test.