■ SUSAN ELKINS et al., Respondents-Appellants, v JONATHAN FERENCZ, Appellant-Respondent. [677 NYS2d 342] —Judgment, Supreme Court, New York County (Emily Goodman, J.), entered October 24, 1996, upon a jury verdict in favor of plaintiffs, which, as reduced by the trial court, awarded plaintiff Susan Elkins $465,052.36 and plaintiff Andrew Elkins $33,297.16, reversed, on the law, without costs, the judgment vacated and the complaint dismissed. The Clerk is directed to enter judgment in favor of defendant-appellant dismissing the complaint.

In this dental malpractice action against Mrs. Elkins' longtime dentist, based upon allegations that plaintiff suffered

severe periodontal disease resulting in the loss of four teeth and other injuries due to defendant's failure to properly diagnose or treat her condition or timely refer her to a periodontist, plaintiffs have failed to establish a prima facie case of dental malpractice and defendant's motion for a directed verdict should have been granted.

Defendant was plaintiff Susan Elkins' general dentist from 1971 to 1992. As found by the trial court, during those 20 years, she visited him approximately 60 times for treatment, which visits consisted of cleanings, clinical examinations including regular periodontal probing, full mouth series X-rays on a regular basis, restorative work and referrals to specialists when necessary. In August 1991, defendant examined plaintiff and, according to plaintiff, he referred her to a periodontist because he did not like the way her bottom gums looked.

Plaintiff's dental expert, Dr. Kent, a longtime friend of her husband, testified that Mrs. Elkins first visited him in February 1992, complaining that her front teeth were getting loose and separating and that she also had jaw pain. He examined plaintiff's full mouth X-rays taken by defendant in 1971, 1976, 1980, 1985 and 1991. Although he testified that bone loss began to show in 1980, the expert conceded that he did not know whether plaintiff had active periodontal disease in 1980. He also admitted that a person could have had bone loss evidenced on an X-ray, recession of the gum and gingiva, or space between the teeth without active periodontal disease.

His examination revealed bone loss, tooth mobility and spacing and periodontal pockets ranging up to six millimeters. Since he was not a periodontist, he too referred the patient to one. Based upon his examination he also testified that he could not say "whether or not there were any departures from accepted dentistry. I could just say what I saw in the chart, and what I saw in the X-rays was a patient that had been followed from the 1970's." On cross-examination he agreed that there could be bone loss without active periodontal disease and that some, if not most, people eventually have some bone loss.

Plaintiff's only medical expert was Dr. Kent, while Drs. Tannenbaum, Hoexter and Bral, the other dentist-witnesses who had personally treated her, were all called by the defense and were not helpful to her case. Therefore, of the approximately 11 health care professionals that treated plaintiff at some point, she only summoned Dr. Kent to the stand.

Moreover, notwithstanding that plaintiff may have developed some problems with her teeth while she was being treated by defendant, her real difficulties did not manifest themselves

until after she had consulted Dr. Kent, who by his own admission was not a periodontist. In addition, Dr. Kent acknowledged that, except for the bone loss indicated on the X-rays, he had no basis for believing that plaintiff had been suffering from periodontal disease prior to 1991 or that defendant had failed to probe his patient's periodontal pockets, which even Dr. Kent conceded was the preferred method for diagnosing periodontal disease. Although plaintiff endeavored to convince the jury that defendant had not regularly probed for pockets in the course of examining her, her trial testimony was flatly contradicted by her own deposition testimony that he had, in fact, routinely checked her gums with an instrument that she was unable to name. In that regard, Dr. Kent was cross-examined as follows:

"Q. Doctor, if I told you that Mrs. Elkins has testified that after every visit with the hygienist, Dr. Ferencz came in and examined her personally, would that be good and accepted practice?

"A. If that's what he did, yes.

"Q. Doctor, do you have any reason to believe that when he went in and examined her, that he didn't use this periodontal probe?

"A. Do I have any reason to believe that he didn't.

"Q. Do you know that he didn't. Were you told that he didn't?

"A. The only reason I have to believe is to see the X-rays, but no, I don't know for a fact. I have no idea.

"Q. Did you read in Mrs. Elkins' examination before trial where she testified—strike that. Doctor, do you know personally if Dr. Ferencz ever used any type of instrument to take a measurement?

"A. I have no idea.

"Q. Doctor, if I told you that Mrs. Elkins has testified—

"THE COURT. What page?

"[Defense Counsel] 49, line 16.

"Q. 'Question: How did he check the gums? Answer: He has an instrument that he checks the gums, I think. I don't know the names, I don't know the names of the instrument where he checks to see if there is any. He measures the gum or something, I believe. I don't know what it is called.' Now, doctor, would that be consistent with a dentist coming in and measuring pockets?

"A. Yes."

Another supposed symptom of periodontal disease was that

plaintiff had reported to Dr. Kent that her teeth had been getting looser. Nevertheless, plaintiff responded "no" to defense counsel's questions concerning whether she had, during all the years that she had been treated by defendant, experienced any bleeding in her gums or felt her teeth to be loose and Dr. Kent recognized that bleeding of the gums is "a sign of periodontal disease". In short, Dr. Kent conceded that (1) periodontal disease could not be diagnosed simply from an indication of bone loss on an X-ray; (2) he lacked any knowledge that defendant had failed to probe plaintiff for periodontal pockets but that plaintiff's deposition statement was consistent with the fact that defendant had regularly performed such probing; and, (3) bleeding of the gums, which plaintiff denied having while she was being treated by Dr. Ferencz, was a common portent of periodontal disease.

Consequently, quite apart from any conceivable tobacco and/or prescription drug abuse by plaintiff, which the jury certainly could reject as a causative factor of her dental difficulties, and accepting that a long time personal friend of plaintiff's husband could be a disinterested expert witness (in fact, the sole expert witness), plaintiff did not establish a prima facie case of dental malpractice, much less that a finding of malpractice was supported by a preponderance of the credible evidence. Although it is true that the standard for setting aside a jury verdict is a demanding one, when viewed in the light most favorable to plaintiffs, who are the prevailing parties (*see, Richardson v Danna & Sons*, 245 AD2d 20; *Heller v 83rd St. Investors Ltd. Partnership*, 228 AD2d 371, *lv denied* 88 NY2d 815), there is simply no valid line of reasoning and permissible inferences that could possibly have led to the conclusion that plaintiff demonstrated any malpractice on defendant's part (*see, Cohen v Hallmark Cards*, 45 NY2d 493, 499; *Budzanoski v Pfizer, Inc.*, 245 AD2d 73; *Cohen v Simmons*, 240 AD2d 191).

Inasmuch as we find an absence of proof of dental malpractice, it is unnecessary for us to reach the other points raised by the parties. However, were we not dismissing the complaint, a new trial would have been warranted due to the trial court's failure to instruct the jury, as requested, with regard to comparative negligence.

It was the crux of the defense that plaintiff bore a major responsibility for the development of her periodontal disease due to her heavy use of prescription drugs and tobacco, her failure to furnish a complete and accurate medical history and the undue delay of treatment after defendant's discovery of the periodontal condition. The principle of comparative negligence

is applicable to medical or dental malpractice (*see, Suria v Shiffman*, 67 NY2d 87; *Bellas v Kurpis*, 182 AD2d 542) and, under the facts of this case, it was reversible error not to charge comparative negligence. Concur—Nardelli, J. P., Tom and Andrias, JJ.

Mazzarelli and Saxe, JJ., dissent in a memorandum by Saxe, J., as follows: "To set aside a jury verdict * * * '[i]t is necessary to first conclude that there is simply no valid line of reasoning and permissible inferences which could possibly lead rational [persons] to the conclusion reached by the jury on the basis of the evidence presented at trial' " (*Parkin v Cornell Univ.*, 78 NY2d 523, 526, quoting *Cohen v Hallmark Cards*, 45 NY2d 493, 499). It is respectfully submitted that the majority has failed to uphold that sound and time-honored principle.

In finding Dr. Ferencz liable for malpractice, the jury necessarily (1) found that Dr. Ferencz had negligently failed to detect a condition which had been present for years, which failure was a substantial factor in causing harm to plaintiff, and (2) rejected the dentist's defense that he had expeditiously diagnosed Ms. Elkins as suffering from Rapid Progressive Periodontal Disease. Sufficient evidence was presented at trial to support this conclusion.

At the outset, it bears emphasis that Ms. Elkins's reliance upon only one expert does not undermine her case; it is axiomatic that the number of expert witnesses testifying for each side is immaterial (*see*, PJI 1:23; *Torem v 564 Cent. Ave. Rest.*, 133 AD2d 25, 26). Moreover, since Dr. Kent's friendship with plaintiff's husband was made known to the jury, the jury was in a position to discount his credibility as they saw fit, and declined to do so.

Although Dr. Kent, plaintiff's expert witness, did not state outright in so many words that defendant's care of plaintiff had constituted a departure from accepted dentistry, the use of such "magical words" is not required (*Matott v Ward*, 48 NY2d 455, 463; *John v City of New York*, 235 AD2d 210). From Dr. Kent's testimony, reasonable people could conclude that defendant had failed to use reasonable skill and care in treating plaintiff, and that it was more probable than not that his failure was a substantial factor in causing harm to plaintiff. The jury had a sufficient basis upon which to find that Ms. Elkins's periodontal problem had developed over the years during which Dr. Ferencz had treated her, that the dentist should have observed the problem and taken action much sooner, that his failure to do so was a departure from good and accepted dental practice and that it was a proximate cause of her injuries.

Specifically, Dr. Kent testified that in February 1992 Ms. Elkins's periodontal chart showed that she was in a stage of periodontitis where she had significant bone loss in the anterior segment, and that her front teeth had a lot of bone loss around them. Dr. Kent explained that examination of the X-rays taken of plaintiff's mouth over the span of approximately 20 years clearly showed progressive bone loss through those years. He characterized the bone loss from 1980 to 1991 as "very, very clear," "dramatic" and "tremendous." He also observed spacing between plaintiff's front teeth that would not normally be seen in the absence of periodontal disease. He added that in addition to her front teeth drifting, plaintiff "had a periodontal problem that manifested itself throughout her whole mouth * * * [involving a] collapsed bite or a collapsed vertical dimension, [so that] when she was biting, her front teeth were taking such a brunt of the bite that the pressure * * * was pushing out the front teeth every time she bit or occluded."

In rejecting plaintiff's evidence as insufficient, the majority emphasizes that, upon cross-examination, Dr. Kent conceded that (1) periodontal disease could not be diagnosed merely from an indication of bone loss on an X-ray; (2) there could be bone loss without active periodontal disease and some, if not most, people eventually have some bone loss; (3) he lacked any personal knowledge that defendant had failed to probe plaintiff for periodontal pockets; and (4) bleeding of the gums, which plaintiff denied having while she was being treated by Dr. Ferencz, was a common portent of periodontal disease.

However, these facts, although they undercut plaintiff's evidence, do not completely negate it. While Dr. Kent conceded that observation of bone loss cannot alone support a diagnosis of periodontal disease, he clearly testified that the existence of progressive bone loss *is* an indication of periodontal disease, and that such progressive bone loss should be noted by a treating dentist and appropriate remedial action taken. Indeed, even defendant's witness, Dr. Michael Bral, agreed that bone loss can be a sign of periodontal disease.

Furthermore, the jury was entitled to reject Dr. Ferencz's assertion that he had performed gum probings at Ms. Elkins's examinations; importantly, Ms. Elkins's chart contained no notation of periodontal pocket depths as found at these purported examinations. Nor did Ms. Elkins's deposition testimony, to the effect that Dr. Ferencz had used a tool to probe her gums, establish that he used a periodontal probe either properly or consistently.

The trial court properly declined to permit the testimony

proffered by defendant as to plaintiff's prior cocaine use and its effect on her periodontal condition. No proper showing was made that the proposed witness had any expertise on the issue, and the intended testimony in this respect was too speculative to be admitted.

As to the court's charge to the jury regarding defendant's claim of subsequent malpractice by Dr. Kent in his treatment of plaintiff, the trial court correctly charged the jury as to aggravation of injuries by subsequent malpractice and declined to charge the jury as to intervening causation. Any malpractice in plaintiff's subsequent treatment would not have been an intervening cause of the plaintiff's ultimate injuries, but rather, the type of subsequent malpractice that is a foreseeable consequence of the defendant's malpractice (see, Glaser v Fortunoff of Westbury Corp., 71 NY2d 643, 647; Hill v St. Clare's Hosp., 67 NY2d 72, 82).

The assertion of the majority that a new trial would be required by the trial court's failure to charge comparative negligence is also in error. While defendant's attorney listed that pattern charge in his written Requests to Charge, he offered no exception to the court's failure to charge the jury on that point, and therefore has waived his right to raise the point on appeal (see, CPLR 4110-b; Loucas v A & A Trucking Co, 134 AD2d 326). Indeed, since the summation of defendant's counsel contained no reference to the concept of comparative negligence, and no objection was raised to the form of the verdict sheet, which lacked any provision for a finding of comparative liability on the part of plaintiff, it is apparent that the waiver of this point was fully intended by defendant's trial counsel.

Defendant's remaining argument regarding the verdict sheet is without merit, in that counsel never objected to the sheet's form or content, and in any case plaintiff did not in fact submit multiple theories of liability to the jury. The single question posed to the jury as to liability was therefore proper.

However, I find the jury's award of $400,000 for pain and suffering to be excessive, and I would reduce the award for past pain and suffering from $300,000 to $100,000 and the award for future pain and suffering from $100,000 to $50,000. Therefore, although I would affirm the finding of malpractice, I would set aside the judgment and order a new trial unless the plaintiff stipulated to a reduced damages award in the total amount of $205,500.